## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CR-4067-01- |
| | ) | |
| STEPHEN GREGORY STROBEL, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW defendant Stephen Gregory Strobel, by and through counsel, and submits this Sentencing Memorandum in support of a sentence of sixty months and five years of supervised release with conditions.

## PART I – SENTENCING GUIDELINE RANGE

Mr. Strobel timely objected the pre-sentence investigation report ("PSR") which calculated a total offense level of 42 and a criminal history category of I, providing a sentencing range of 360 months to life imprisonment. Notably, the base offense level is 22. The total offense level is calculated based adding approximately 23 levels of aggravating factors, i.e. "specific offense characteristics" to the base level offense and then subtracting three levels because of Mr. Strobel's acceptance of responsibility. Mr. Strobel timely objected to the PSR including objections to both certain factual allegations contained in the PSR Report and to the aggravating factors/specific offense characteristics. While Mr. Strobel's objections are contained in the final PSR Report, they are also set forth herein as follows:

1

**Paragraph 24:** As noted in paragraph 2(b), the parties stipulated in the Plea Agreement that the applicable guideline section for the offense of conviction is U.S.S.G. §2G2.1. However, the PSR provides a guideline calculation based upon U.S.S.G. §2G2.2 rather than §2G2.1. Therefore the entire sentencing calculation is incorrect. Mr. Strobel asserts that the base level offense pursuant to §2G1.1 is a 34. Mr. Strobel should also receive the benefit of his Plea Agreement.

**Paragraphs 25, 26, 27, 28, 29, 30, 34, 38:** These paragraphs were all based upon U.S.S.G. §2G2.2 rather than §2G1.1 as agreed to by the parties. Therefore, all the calculations contained in these paragraphs are incorrect. Notwithstanding the foregoing, there are certain Specific Offense Characteristics which do apply under U.S.S.G. §2G2.1 and the relevant characteristics are set forth below in an effort to arrive at a Total Offense Level as follows:

+2    §2G2.1(b)(1) – the offense did involve a minor who had attained the age of twelve years, but not attained the age of sixteen years. This results in a 2 level increase.

+2    §2G.1(b)(3) – the offense involved distribution. This results in a 2 level increase.

The PSR suggests that there is an image of sadistic or masochistic conduct. Counsel for Mr. Strobel disputes this contention. Sadomasochism is "the giving or receiving of pleasure from the acts of pain or humiliation" according to Wikipedia. Counsel is unaware of any such image. If in fact such an image exist, a 4 level enhancement appears authorized pursuant to U.S.S.G. §2G2.1(b)(4), but that increase is not included in this calculation as no such image is believed to exist. Counsel will need confirmation of the existence of such an image before he may concede this enhancement.

**Paragraph 34:** The Adjusted Offense Level is a 38 as calculated pursuant to U.S.S.G. §2G1.1 and not a 45 as calculated by the PSR.

**Paragraph 38:** The Total Offense Level is a 35 as calculated pursuant to U.S.S.G. §2G1.1 and not a 42.

**Paragraph 63:** The sentencing guideline range based upon a total offense level of 35 and a criminal history category of I is 168 to 210 month. The Government has further recommended a sentence at the low end of the guideline range pursuant to the Plea Agreement.

Mr. Strobel contends his Total Offense level is a 35 with a criminal history category of I which provides for a sentencing range of 168 to 210 months. However, because the mandatory minimum sentence required by 18 U.S.C. §2252(a)(2) and (b)(1) is not less than five years, Mr. Strobel requests that the court impose a sentence of sixty months with five years of supervised release.

## PART II – DOWNWARD VARIANCE

A sentence of sixty months and five years of supervised release with conditions reflects the nature and circumstances of Mr. Strobel's offense, his history and characteristics, the need for punishment and deterrence, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a) (2).

## INTRODUCTION

As Attorney General Eric Holder noted during his August 12, 2013 remarks to the American Bar Association, "[i]t's clear [] that too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason." While confinement has its place in promoting punishment and deterrence, it should not be used when it would most likely lead to further harm to the community and to the defendant.

### *Policy on Computer Related Child Pornography Offenses is Flawed*

In the Western District of Missouri the vast majority of child pornography cases end with the defendant going to prison. Is this policy of locking up child pornographers really working? Stiffer sentences are not deterring these offenders. There are more child porn cases almost every year. Offenders who are passive viewers, those who have not touched, filmed, or photographed a victim, are excellent candidates for community supervision.

3

The vast majority of the cases in the Western District of Missouri originate from some form of peer-to- peer file sharing, where law enforcement finds pictures or videos on a suspect's computer. Here, the concept was the same, but for the instant case, defendant Stephen Strobel (hereinafter called "Stephen" or "Strobel") engaged in a chat and role playing with a minor through the use of the internet.

Normally, after formal charges are issued, the pre-trial office recommends release of these offender on unsecured bonds and they remain in the community with directives to attend counseling. Often, sex offender counseling and monitoring by the pretrial office is the first step in the treatment process. Making sure offenders are integrated into treatment and their computer usage and access to children are restricted is an excellent means of protecting the community and making sure the offender does not re-offend.

Supervision of the defendants is a good thing. Monitoring computer usage and the imposition of other restrictive conditions is an acceptable avenue of supervision and deterrence. Incarceration for these types of possessors who have not actually touched a victim, however, is expensive and really only serves the purpose of punishment. It took decades for legislators and prosecutors to realize drug courts were the way to deal with drug possessors and users. The same is true for DUI and DWI courts. Now these courts are the norm. Child pornographers need the same type of treatment and close supervision. Wasting taxpayer dollars for non-violent, possessors on the most expensive alternative– incarceration - is not logically justified based on the scientific data.

The current policies are flawed and need to be changed, but in the meantime the Court can move in the right direction and fashion sentences that are sufficient, but not greater than necessary, to address the purposes of sentencing. Many of the offenders caught

4

and charged with this electronic sharing and possession of child pornography have no idea of the severity of punishment that is associated with these crimes. They are shocked when they learn that as a first-time offender, such as Mr. Strobel, they are potentially headed to prison for a considerable period of time, have to register as a sex offender for the rest of their lives, and have a felony conviction for viewing and possessing images that can be found easily on the internet and viewed in the privacy of their home. This is further evidence to establish that harsh sentences and collateral consequences are not deterring these crimes. If punishment is really the reason for a prison sentence, then an analysis of the collateral consequences of a child pornography conviction should be considered in evaluating punishment.  In a fairly recent decision, *United States v. Robinson*, Senior Judge Arthur Tarnow, from the Eastern District of Michigan, Southern Division gave an excellent analysis of why a sentence similar to what Mr. Strobel is requesting was appropriate. See Exhibit A, "*Robinson* opinion," attached hereto and adopted herein.

### A. Nature and Circumstances of Mr. Strobel's Offense and Procedural History of the Case.

*Case History*

On May 12, 2014, the officers with the Missouri State Highway Patrol contacted Strobel as his place of employment. The officers contacted Strobel after learning of a sexually explicit chat between Strobel and B.G., a thirteen year old who lived in Wooster, Ohio.  Strobel cooperated with law enforcement and shared with the officers information regarding his chats, possessing images of underage children and trading photos with other individuals. On May 13, 2014, officers obtained a search warrant for Strobel's computer, digital media and iPhone.

Strobel obtained the undersigned attorney, and was thereafter released from the Miller County jail on bond. Charges were initially filed in Miller County Circuit Court, but the United States Attorney's Office later filed charges against Strobel. Strobel was subsequently released on an unsecured bond. He began treatment as ordered by the Court. Strobel has been on pretrial supervision for almost 2 years. He has appeared at all required court dates and has no violations of supervision. During the 2 years since his initial arrest, he has had no violations. In fact, other than this arrest, Stephen Strobel has never been in police custody. Strobel has demonstrated for over the past two years he can be a law-abiding, functional individual in society. Moreover, for the last two years he has shown that he can follow all of the courts directives and restrictions while remaining in the community.

### Stephen Strobel's History and Characteristics

*Stephen Strobel's Background*

Stephen Strobel is 26 years of age. He is before the Court for his first criminal offense. The offense was committed when Strobel was twenty-four. Stephen's parents divorced when he was eight years old. His parents maintained joint custody and they resided in the same town. Stephen has a good relationship with both of his parents. He is very close to his father and views him as a role model. Stephen has one brother who resides in Columbia, Missouri. Stephen maintains a good relationship with his brother. Stephen lived in Chamois, Missouri most of his life except for the four years he attended college at Missouri State University (MSU) in Springfield, Missouri. Stephen completed a Bachelor of Music Education on May 18, 2012 graduating with an overall grade point average of 3.94 on a 4.0 scale.

Stephen was formerly employed as the music teacher with the St. Elizabeth High School in St. Elizabeth, Missouri from August 2012 until May 2014. Stephen resigned his position of employment as a result of his arrest for this offense. He could have remained on paid administrative leave, but Stephen believed his resignation was best for the school and community. Although the school told the PSR writer that that would not consider him for rehire, the did state he was a good and reliable employee.

Numerous individuals have written letters describing Stephen's character and work ethic. Stephen has the support of family members and friends who have written letters in support of him. *See* Exhibits B1 through B20, Character Letters, attached hereto and adopted herein.

Following his resignation, Stephen attended counseling with Donald R. Smith, LPC. Stephen began counseling back on July 7, 2014. Stephen was very open with Mr. Smith about the circumstances that led him to seek out professional counseling. Mr. Smith has stated in his letter in support of Stephen that Stephen has made progress in understanding what led to making poor choices, chiefly among them, the behaviors that led to the filing of these criminal charges. Mr. Smith states that Stephen has a new balance in his life and has a positive support system. See Exhibit C, Letter from Donald R. Smith, LPC, attached hereto and adopted herein.

Stephen was unsure about whether he could find employment following his arrest. Therefore, in lieu of work and while on bond, he volunteered in the community, including volunteering at the Samaritan Center and at the Jefferson City Animal Shelter. See Exhibit D, Samaritan Center, attached hereto and adopted herein. See Exhibit E, Jefferson City Animal Shelter, attached hereto and adopted herein. Stephen ultimately determined that he

needed to obtain employment. He secured a job at Canteen Vending in Jefferson City, Missouri as a delivery driver. He quit this job on April 18, 2016 due to the possibility of being taken into custody at his plea hearing. The PSR writer contacted this employer who described Stephen as a good employee. Stephen subsequently obtained employment with a family friend, Kathi Schollmeyer, in Chamois, Missouri. He has done yard work for her, staining fencing and other home maintenance projects.

Stephen has no juvenile adjudications and no criminal history. Stephen has never used any controlled substance unless it was prescribed by a physician. He rarely consumes alcohol. Other than this case, Stephen has been a model citizen. Stephen knows that after his release from prison he is going to have to do a lot of work and face a lot of heartache to try and get his life back, but once he serves his obligation of prison he is eager to face this challenge.

**Legal Framework**

*Child Pornography Crimes*

Congress delineated seven separate offenses requiring varying degrees of culpability under 18 U.S.C. § 2552A. *United States v. Robinson*, No. 09-20091 at 3 (E.D. Mich. Sept. 19, 2013). Congress then defined separate minimum and maximum punishments for these offenses, showing that Congress recognized that the different offenses are considered more or less serious. *Id*. at 3-4. Under 18 U.S.C. § 2252(a), Congress mandated imprisonment for not less than five years on certain computer related pornography offenses and not more than ten years, with no mandatory minimum sentence on others. *Id*. Congress clearly recognized that crimes related to child pornography are graduated in terms of seriousness, culpability, and necessary punishment. *Id*. The Supreme Court has clearly established that the

Sentencing Guidelines are not mandatory, rather advisory. *Id*. A sentencing court must consider the Guidelines' ranges, but the court may "tailor the sentence in light of other statutory concerns." *Id*. at 5. A sentencing court's discretion is governed by 18 U.S.C. § 3553(a) factors and the Guidelines are just one factor among several that courts must consider when determining an appropriate sentence. *Id*. Specifically, the sentencing judge must make an "individualized assessment" based on the facts presented. *Id*. The sentencing judge should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011). Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime. *Id*. at 1240.

In the *Robinson* case, the defendant was charged with a single count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5), which is similar conduct. *United States v. Robinson*, No. 2:09-CR-20091 at 1 (E.D. Mich. Sept. 19, 2013). The defendant had an offense level of 28 and no criminal history placing him in a Criminal History Category of I, providing the defendant with a Sentencing Guideline range of 78 to 97 months. *Id*. at 1-2. The sentencing judge considered the defendant's offense, lack of criminal history, voluntary enrollment in treatment, and a psychological report finding that the defendant was not a pedophile and sentenced the defendant to one day in custody and five years of supervised release. *Id*. The court also considered that the defendant had a stable residence, was in a committed relationship, and that he was responsive to his treatment routine. *Id*. at 8. The court found that it would be against the defendant's and

society's interest in removing the defendant from his current structure, even a short term of imprisonment, would be highly disruptive to his treatment. *Id*. at 10.

The Court of Appeals reversed this decision and the defendant was resentenced. The Court imposed a new sentence of one day in custody and increased the term of supervised release from five years to ten years, which included all standard conditions, necessary mental health treatment, and regular lie detector tests. *Id*. at 3. The Court gave an interesting analysis of the discretion Congress gave the Court and the discretion given to the Court based on the prosecutions charging decision. In sum, Congress defined a graduated series of crimes, and in its own discretion the Prosecutor charged the defendant with a crime that does not have a statutory minimum punishment. *Id*. at 11. Therefore, the court used its discretion to impose a sentence set within the bounds set by Congress and the Prosecution. *Id*.

The Supreme Court has held that section 3582(a) of the Sentencing Reform Act (hereinafter "SRA") "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation," because the Act specifically mandates that "imprisonment is not an appropriate means of promoting correction and rehabilitation." *Tapia v. United States*, 131 S. Ct 2382, 2391 (2011). The *Robinson* court determined that increasing the defendant's custodial sentence could not and would not improve or even maintain his rehabilitative efforts, rather it would only diminish any of his rehabilitative goals. *United States v. Robinson*, No. 2:09-CR-20091 at 11 (E.D. Mich. Sept. 19, 2013). The court noted that "while confinement has its place in promoting punishment and deterrence, it should not be used when it would most likely lead to further harm to the community and to the defendant." *Id.*

*Sentencing Scheme under the Current Law*

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve

§ 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009).

This Court may properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not

suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.[1]

### Requested Sentence

Stephen Strobel asks the Court to impose a sentence of sixty months in custody and five years of supervised release.   Further, imposition of the following restrictive conditions will protect the community, deter Stephen from re-offending and will allow him to get needed therapy and treatment:

---

[1] *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop §2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *id*. at 608-09 ("Congress, of course. . . may enact directives to the Commission which the Commission is obliged to implement," but "*Kimbrough* permits district courts to vary even where a guideline provision is a direct reflection of a congressional directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *id*. 963 n.3 ("That Congress has the authority to issue sentencing directives to the Commission" and "that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*, 575 F.3d  83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender, fast-track, and child pornography guidelines); *id*. at 93-94, 97 (district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject *any* Guideline on policy grounds," but defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from § 2G2.2 was "quite forceful" but he "did not raise the argument that the Guidelines are entitled to less deference because they are not the result of empirical study by the Commission").

13

*Restrictive Conditions*

1. Comply with all sex offender registration laws.

2. Computer usage subject to the discretion of the Court, if use of a computer or internet is permitted, shall be only with monitoring software or on a public computer where pornography cannot be accessed (e.g. public library).

3. No contact with minors, without permission of the probation officer and if contact is allowed it shall be supervised.

4. Attend weekly sex offender treatment, including group and individual counseling to address the offense conduct, to identify risk factors, and develop a treatment plan to avoid future conduct of this nature.

5. Periodic polygraph examinations as required by the probation office, to measure compliance with supervision conditions and to provide safety to the community by strictly monitoring the Defendant.

6. Maintain employment to help cover the copayment costs of therapy and polygraphs and to ensure the Defendant is financially self-sufficient.

7. Abide by all state laws related to sex offenders that include, but are not limited to, registering all online screen names or email addresses, not participating in Halloween, and not residing within a certain distance of a school or daycare, and not loiter in a public park near a playground.

Unlike the advisory guideline of 360 months to life imprisonment, the requested sentence is "sufficient, but not greater than necessary" to serve sentencing purposes. This sentence is also consistent with sentences given in other child porn cases a few examples are listed below:

1. Support of Family and Family Obligations:
   a. *United States v. Smith*, 09-CR-0740 (E.D. Mo. 2010) (defendant had strong family and community support);
   b. *United States v. Driskell*, No. 08-CR-641 (E.D. Mo. 2009) (defendant had illegal images available for distribution through file sharing program, but took steps to delete illegal images, and had significant family obligations) decided by this Court;
   c. *United States v. Jones*, No. 04-CR-1840 (D.N.M. 2004) (defendant had Asperger's syndrome and family obligations);

2. Positive Work History:
   a. *United States v. Smith*, No. 08-CR-31 LRR (N.D. Iowa 2009) (defendant had a strong work history);
   b. *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (Defendant lost career because of case, was progressing in treatment. Defendant received probation with guideline range of 46-57 months);
   c. *United States v. Hall,* No. 12-CR-20119 (W.D. Tenn. Jan. 16, 2013) (sentenced to time served (one day) followed by 10 years of supervised release, with 5 years home confinement, where defendant had been sexually abused as a child, suffered from serious medical problems and depression and had a long work history);
   d. *United States v. Lang*, No. 09-CR-036 (M.D. Tenn. Nov. 21, 2012) (sentenced to time served (6 days) followed by 7 years of supervised release with condition that he teach in prison for 40 hours a week for 3 years, plus a $10,000 fine where defendant had been a professor of sociology for 35 years, had strong family and community support, had only a minimal amount of child pornography, and immediately sought therapy).

3. Defendant had a low risk of recidivism:
   a. *United States v. Campbell*, No. 09-CR-3023 (D. Neb. Sept. 16, 2010) (sentenced to 5 years' probation with 120 days in halfway house followed by six months of home confinement on electronic monitoring, 100 hours of community service, plus a $7,500 fine, where images were not as serious as most, defendant had successfully passed a polygraph, and forensic evaluations indicated that he presented little risk of recidivism);
   b. *United States v. Teves*, 11-CR-10351 (D. Mass. 2008) (sentenced to five years' probation, the first six months on home confinement with electronic monitoring where defendant's treating physicians reported that he presents no danger and that incarceration would interrupt successful treatment);
   c. *United States v. Saenz*, No. M-05-CR-877 (S.D. Texas 2011) (defendant had been abused as a child, served 5 years of home confinement, and never acted out; he possessed 126 images, including those of boys being raped);
   d. *United States v. Syzmanski*, No. 08-CR-417 (N.D. Ohio June 1, 2011) (sentenced to one day in prison followed by 5 years of supervised release where 54-year-old defendant had strong work record and community

support, health problems, and therapist indicated that he presented no risk to children);

   e. *United States v. Moreira*, No. 10-CR-002 (D.D.C. May 21, 2010) (sentenced to 5 years' probation with victim restitution ordered totaling $11,600 where clinical evaluations indicated defendant did not present a risk of harm and defendant had family support and strong work history).

4. No clearly defined reason for sentence counsel could find:

   a. *United States v. Arzberger*, No. 08-CR-894 (S.D.N.Y. Apr. 16 2010) (sentenced to 5 years' probation where guideline range was 41-51 months);

   b. *United States v. Carpenter*, No. 08-CR-06256 (W.D.N.Y. 2009) (defendant possessed several videocassettes containing at least 150 illegal images);

   c. *United States v. Graci*, No. 2:09-CR-00131-LS-1 (E.D. Pa. 2009) (defendant a former elementary school teacher, purchased access to child pornography websites on three different occasions);

   d. *United States v. Connelly*, No. 07-CR-830 (D.N.J. Dec. 22, 2008) (sentenced to 5 years' probation and a $1,000 fine where guideline range was 78-97 months);

   e. *United States v. Boyden*, No. 2:06-CR-20243-LFZ (E.D. Mich. 2007) (defendant purchased access to three child pornography websites over a number of years and searched for illegal images).

5. Defendant was in therapy and making progress with treatment:

   a. *United States v. McDonald*, No. 3:08-CR-30031 (D. Mass. 2008) (defendant underwent therapy);

   b. *United States v. Polito*, 215 App'x 354, 356-57 (5th Cir. 2007) (young immature defendant who had never before been arrested for any offense; presented no threat to the community or young children; receiving mental health treatment, maintained employment, and avoided any problem with the law, and a term of imprisonment would interrupt mental health treatment);

   c. *United States v. Prisel*, 316 Fed. App'x 377 (6th Cir. 2008) (defendant possessed 1,189 images including those stored on disks and hard drives, and ordered video tapes from overseas, but had undergone mental health treatment, had family responsibilities, and presented no danger to children);

   d. *United States v. Cernik*, No. 07-20215, 2008 WL 2940854 (E.D. Mich. July 25, 2008) (defendant currently in treatment, employed, and incarceration would increase, not decrease defendant's risk to the public);

   e. *United States v. Manke*, 1010 U.S. Dist. Lexis 3757 (E.D. Wis. 2010) (defendant possessed more than 1200 images, chatted with others to obtain more images, but made progress in mental health treatment before sentencing).

16

6. Defendant was a younger or first-time offender:
   a. *United States v. Ramos*, No. 08-CR-30034 (D. Mass. Jan. 13, 2010) (sentenced to 4 years' probation, 12 months of which in a halfway house, where defendant had no criminal history and had suffered from major depression over many years);
   b. *United States v. Butler*, No. 1:07-CR-00466 (M.D. Pa. 2008) (defendant was in his sixties with no prior criminal conduct);
   c. *United States v. Helbig*, No. 08-CR-30052 (D. Mass. Sept. 23, 2009) (sentenced to five years' probation, six months of which in a halfway house and six months home confinement, based on defendant's immaturity and lack of judgment, deep contrition and understanding of the seriousness of the offense, lack of risk of harm to children, and particularly strong family support);
   d. *United States v. Rhoads*, No. 12-CR-40078 (D. Kan. Jan. 30, 2013) (sentenced to 5 years' probation (guideline range of 97-120 months) where defendant as 18-19 years old at the time of the offense, was a victim of childhood abuse, and was successfully undergoing outpatient sex offender treatment);
   e. *United States v. Huffman*, No. 09-CR-20073 (D. Kan. 2010) (defendant was young and attending treatment).

7. Defendant had no pedophilic interest or took ownership for the crime:
   a. *United States v. Proulx*, 11-CR-10274 (D. Mass. Feb. 16, 2012) (sentenced to 5 years' probation, the first six months of home detention with electronic monitoring, where defendant had no pedophilic interest in children, a strong work history, and strong family support);
   b. *United States v. Grosinsky*, 2008 WL 5062845 (E.D. Mich. Nov. 25, 2008) (sentenced to one day in prison followed by 5 years of supervised release, and 100 hours of community service where probation recommended a variance, where the images were of the defendant and a mature-looking male only 3 months shy of 18 who solicited the defendant, the defendant was in treatment and "displays an understanding of his errant ways, and is unlikely to repeat his wrongful conduct").

8. In the cases of *United States of America v. Derek Dunwiddie*, 4:13CR115-CDP, *United States of America v. Michael Samra*, 4:13CR00011-CEJ, *United States of America v. Ronald Oldani*, 4:15CR79-SNLJ, and *United States of America v. Travis Tuttle*, 4:15CR101-AGF - these Courts based upon the same arguments raised in this motion - provided the relief sought herein.

Part I of the following Argument shows that Stephen Strobel is not the dangerous offender Congress had in mind, when it required severe penalties in child pornography cases. It explains with factual and empirical evidence that the circumstances of the offense and Stephen Strobel's characteristics are highly relevant to the statutory purposes

17

of sentencing and the overarching duty to impose a sentence that is sufficient, but not greater than necessary, to satisfy those purposes.

Part II demonstrates that the sentence Stephen Strobel requests will avoid unwarranted disparities and unwarranted similarities. This section includes sentencing data from cases nationwide.

Part III shows that the sentence requested is consistent with federal case law.

Part IV provides evidence to refute each of Congress's reasons for its directives to the Commission to enhance the child pornography guideline and again shows that Stephen Strobel is not the offender Congress had in mind. It also shows that the enhancements the Commission adopted without a congressional mandate were not based on empirical data and national experience. This part also provides an objective basis for the sentence Stephen Strobel requests.

## ARGUMENT

### I. Given the Nature and Circumstances of Stephen Strobel's Offense and His History and Characteristics the Sentence Requested is Sufficient, but not Greater than Necessary, to Satisfy the Purposes of Sentencing

In enacting the SRA, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a).

18

*Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.*

Here, all of the purposes of sentencing point in the same direction. Stephen Strobel is not the dangerous offender Congress envisioned. Incarceration of more than sixty months is not necessary to protect the public, and would be a particularly harsh punishment for Stephen Strobel. Stephen's family circumstances, education, and employment history point to a very low risk of further offending. As a person who is benefiting from and actively participating in community based therapy the low likelihood of re-offending is even further reduced. Any medical or mental health treatment Stephen will yet require is best received outside of prison.

## A. Need for Just Punishment in Light of the Seriousness of the Offense, 18U.S.C. § 3553(a)(2)(A)

### 1. *Seriousness of the offense*

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[2] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general, Stephen Strobel has not been convicted of sexually abusing a child. This

---

[2] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id*. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

distinguishes Stephen Strobel from the offenders Congress had in mind, and is therefore highly relevant. *See United States v. Marshall*, 870 F. Supp.2d 489, 491-92 (N.D. Ohio 2012) (rejecting the presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp.2d 1202, 1207 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober,* 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010).

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. *See* 136 Cong. Rec. S4730 (Apr. 20, 1990). Under these circumstances, where no economic or other incentive was given to anyone to

create more or newer images, there was "no market effect" from Stephen Strobel's actions. Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) [Stabenow, *A Method for Careful Study*].

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) [U.S. Sent'g Comm'n, *1996 Report*]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei *et al.*, *Pedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488,

492 (2005); *see also* Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007).  In short, the change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased.  *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders:  Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

In determining an appropriate sentence, this Court must consider the sentences available by statute.  *See* 18 U.S.C. § 3553(a)(3).  Congress set the statutory range of imprisonment for Stephen Strobel's offense at not less than five years and no more than twenty years.  *See* 18 U.S.C. § 2252(a)(1) and (b)(1).   The bottom of Stephen Strobel's guideline range of 360 months to life imprisonment is well past the statutory maximum. As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders.[3]

Stephen Strobel's has no criminal record, cooperated with police, admitted his involvement, has fully accepted responsibility and is actively involved in treatment. Stephen Strobel is the offender for whom the *minimum* statutorily authorized punishment

---

[3] *See, e.g., United States v. Durham,* 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 2012 WL 236 7084, at *6-7; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702.

is reserved.  One of the goals of the SRA was to provide for proportionality in

punishment among offenses of different seriousness.  S. Rep. No. 98-225, at 45-46

(1983).  The child pornography guidelines fail that goal, as several courts have noted.

*See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 187 (2010); *United States v. Beiermann*,

599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702.

      2.    *Just punishment*

Stephen Strobel must register as a sex offender as part of this case. That

information will be published to the community, his friends and neighbors.  As several

courts have recognized, collateral consequences of conviction, such as registration as a

sex offender, are relevant to the "need" for the sentence imposed to reflect just

punishment.  *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on

remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior

holding that it was inappropriate for the district court to consider the lasting effects of

being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-

75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography

after *Gall*, affirming the district court's finding that the defendant "warranted a lower

sentence because he lost his teaching certificate and his state pension as a result of his

conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive

that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate

deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir.

2008) (affirming below-guideline sentence based in part on court's findings that

defendant suffered substantial mental and personal stress as a result of his prosecution,

because the court's findings "were directly relevant to the § 3553(a) analysis, which

requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

**B. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-

arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. And according to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").

An adequate supervision strategy as suggested herein and which is commonly imposed by the probation office will deter this defendant from committing similar crimes. More importantly, sex offender registration and a felony conviction along with the numerous restrictions of supervision will serve as a means to deter others.

### C.  Need for Incarceration, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.  This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012),[4] and "online offenders who had no history of contact offenses almost never committed contact sexual offenses." Michael C. Seto *et al.*, *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing

---

[4] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/
20120215-16/Testimony_15_Seto.pdf.

child pornography and none were arrested for a contact offense within four years);[5] Helen Wakeling *et al.*, *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending,* 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature [] generally concludes that there is

---

[5] Available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Wollert_2.pdf.

little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall* 870 F. Supp.2d at 492.

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004), as does substantial other research.[6] For sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006).

In short, Stephen Strobel's family support, education, history of employment, success on pretrial release, all strongly support the conclusion that he is unlikely to re-offend. Stephen has participated in counseling with Donald Smith, LPC. Mr. Smith has written a letter which is attached hereto as Exhibit C and adopted herein. While a small minority of defendants convicted of receiving and possessing child pornography may again view child pornography and an even smaller minority may molest children, Stephen Strobel is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that Stephen will never view child pornography again. Supervised release with appropriate conditions is more than sufficient to ensure that he never does.

---

[6] *See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf;

### D. Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D)

In the time since his arrest, Stephen has come a long way in rehabilitating himself. Like the defendant in *Robinson*, removing Stephen from the structure in his life and the counseling he receives to imprison him will only have a negative impact. Stephen remains a productive member of society, and desires to put these charges behind him. Imprisoning him for sixty months would give him ample opportunity to get the treatment he needs to both overcome his internet addiction and substance abuse issues.

### II. The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

As shown above in the memorandum, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Stephen Strobel's characteristics demonstrating

29

that there is no need to imprison him to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community.   In this case, a substantial variance is necessary to avoid unwarranted uniformity between Stephen Strobel and dissimilar defendants who committed dissimilar conduct.  *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108.  The data show that a sentence of one day in custody, a significant period of home confinement, and supervised release for ten years would not create unwarranted disparity.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range.  Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based on a government motion for a variance, and in 3% of cases based on a government motion under § 5K1.1.  *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.

In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Stephen Strobel.  *See Placement of Sentences Under U.S.S.G. §2G2.2 – FY 2011* at 4, http://www.fd.org/docs/select-topics---sentencing/placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4.

### III. The Sentence Requested Meets the Purpose of Sentencing under the Circumstances in this Case and is Consistent with the Law.

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3). Congress has provided for a range of sentence of five to twenty years imprisonment, and if a term of imprisonment is imposed, has authorized a term of supervised release of at least five years and at most life. *See* 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k). "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

In *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012), the defendant possessed 7,100 images, including images of torture and bondage, and the guideline range was 78-97 months. The judge varied downward based on Robinson's individualized circumstances, which included his older age (43) and a "debilitating back condition," and imposed a sentence of one day in prison and five years' supervised release, without any period of home confinement. *Id.* at 772, 775. Stephen is requesting the court to impose the minimum sentence of sixty months.

### IV. The Guideline Rests on Congressional Assumptions That Are Contrary to Empirical Evidence and Commission Action Unsupported By Empirical Evidence, and Recommends a Sentence That Is Greater than Necessary to Serve the Purposes of Sentencing or Any Other Sound Policy Goal.

In the time since the guideline for this type of distribution and possession of child pornography was first promulgated, the offense level applicable to Stephen Strobel's offense before acceptance of responsibility has risen exponentially. Here are the

applicable guideline calculation ranges in the following years for the charge of Receipt/Distribution of Child Pornography (after Acceptance of Responsibility and the inclusion of the enhancements typically applied in these types of cases, with no exception herein): 1987: 12-18 months; 1991: 27-33 months; 1996: 41-51 months; 2000: 70-87 months; 2003: 121-151 months; and, 2004: 210-262 months. This results in a 1750% increase, or a 198 month increase over a defendant sentenced for the same conduct on October 30, 1991. This should not be an inflatable type of market like the price of gas or bread, but if this *were* comparable to gas prices- then if you paid $1.50 a gallon in 1987, then it would be $23.05 a gallon today.

Most of this massive increase was mandated by Congress. In *Kimbrough*, the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. at 94-99. Likewise, Congress, in dictating much of the content of § 2G2.2, relied on "assumptions . . . that more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has expressed objections to some of Congress's directives.

### A. Current Evidence Refutes Congress's Reasons for Increasing Penalties.

Congress directed the Commission to take different actions relevant to Stephen Strobel's guideline calculation. (1) increase the base offense level from 13 to 18 in 1991 (distribution); (2) increase the base offense level from 18 to 22 in 1996 (distribution); (3)

add the 2-level enhancement for use of a computer. Congress itself added the 4-level enhancement for materials depicting sadistic or masochistic conduct and the number-of-images table, which included the 5-level enhancement for more than 500 images.

Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes. These are the same arguments prosecutors assert at sentencing to justify a more severe sentence.

1. *The belief that child pornography possessors are pedophiles who use pornography to molest children.*

When it directed the Commission in 1991 to increase the base offense level from 13 to 18, Congress acted on the belief that those who possess child pornography are actually predatory child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet

33

the psychological profile of those likely to engage in molesting children.").  When Congress directed the Commission in 1995 to increase the base offense level from 18 to 22, its discussion focused on "*predatory pedophiles* [who] sell, purchase and swap" child pornography to "satisfy prurient desire."  141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley).  When it directed the Commission to define "distribution" to include distribution for "a nonpecuniary interest," Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch).  And while there was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements.  *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.

In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes."  Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012) [Hamilton, *Child Pornography Crusade*].  Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id.* at 1723.  Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography."  *Id.* at 1715.

There is no evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. When Congress added the enhancement for sadistic or masochistic materials to § 2G2.4 for possession offenses, it simply mirrored the same enhancement the Commission had added to § 2G2.2 for trafficking offenses in 1990, which in turn mirrored the same enhancement under § 2G3.1, the adult obscenity guideline. *See* U.S. Sent'g Comm'n, *History* at 15 n.68. The § 2G3.1 enhancement, in turn, was not based on empirical evidence; indeed, the Commission had proposed eliminating it but retained it for the sole reason that the Department of Justice objected to its removal. U.S. Sent'g Comm'n, *Working Group on Child Pornography and Obscenity Offenses and Hate Crime* 42, 45 (1990). Available evidence shows that the level of severity of the images possessed does not correlate to an increased risk of committing another child pornography offense or a contact offense. *See* Jody Osborn *et al.*, *The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. Aggression, Conflict & Peace Res. 16, 19 (2010).

The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 2012 WL 2367084, at *6. With the Internet and programs like Lime Wire, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124.

 2. *The belief that severe punishment for possession will dry up the market and prevent the abuse of children.*

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors

will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[7] And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combating Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists

---

[7]The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. *See Bistline*, 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

whether Stephen Strobel is incarcerated for five years or twenty years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime:  A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, *Globalization of Crime*"], and thus does not operate by the ordinary rules of supply and demand.   In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet.

Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern.  Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined.  The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children.  *See* U.S. Sent'g Comm'n, *1996 Report*, at 28-30 & n.23; *see also Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction.").   Stephen Strobel is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination.  UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are

generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak *et al.*, *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large

numbers of images does not affect the market. *Id*. at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even 592 additional images is minuscule.").

    3.    *The belief that punishing possessors of child pornography will deter the commission of child pornography offenses.*

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree *et al.*, *Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime – the overwhelming

consensus of the literature is that treatment works, incarceration does not.").[8]   As Judge

Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007:

"The research evidence is unequivocal that incarceration does not reduce offender

recidivism."  Roger Warren, National Center for State Courts, *Evidence-Based Practice

to Reduce Recidivism: Implications for State Judiciaries* 11 (2007).[9]   Instead,

"[i]ncarceration actually results in slightly increased rates of offender recidivism."  *Id.*[10]

　　　　In other words, "across the offender population, imprisonment does not have

special powers in persuading the wayward to go straight.  To the extent that prisons are

used because of the belief that they reduce re-offending more than other penalty options,

then this policy is unjustified."  Francis T. Cullen *et al., Prisons Do Not Reduce

Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011)

("[H]aving pulled together the best available evidence, we have been persuaded that

---

[8] *Available at*
http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_
January302012.pdf.

[9] *Available at* http://nicic.gov/library/files/023358.pdf.

[10]   *See also* Mark W. Lipsey and Francis T. Cullen, *The Effectiveness of Correctional
Rehabilitation: A Review of Systematic Reviews*, 3 Ann. Rev. L. Soc. Sci. 297, 302
(2007) ("[R]esearch does not show that the aversive experience of receiving correctional
sanctions greatly inhibits subsequent criminal behavior.  Moreover, a significant portion
of the evidence points in the opposite direction – such sanctions may increase the
likelihood of recidivism.  The theory of specific deterrence inherent in the politically
popular and intuitively appealing view that harsher treatment of offenders dissuades them
from further criminal behavior is thus not consistent with the preponderance of available
evidence.").  A recent Missouri study shows "that recidivism rates actually are lower
when offenders are sentenced to probation, regardless of whether the offenders have prior
felony convictions or prior prison incarcerations."  Missouri Sentencing Advisory
Commission, *Probation Works for Nonviolent Offenders*, 1 Smart Sentencing 1 (June
2009), http://www.courts.mo.gov/file.jsp?id=45429.  On a three-year follow up from the
start of probation or release from prison, first or second-time offenders on probation were
incarcerated at a significantly lower rate (36%) than those who had been sent to prison
(55%).  *Id.*

*prisons do not reduce recidivism more than noncustodial sanctions.*").  As for why this is

so, the Commission and scholars have identified numerous "criminogenic" effects of

incarceration, including that prison serves as a school for criminals; severs ties to family

and community; diminishes employment options upon release; and reduces rather than

increases the inmate's willingness or ability to conform to social norms.[11]

        In sum, each of Congress's actions rested on unfounded assumptions.  As the

Commission has noted, congressional directives "creat[e] anomalies in the guidelines

structure" and "new sentencing disparities," and "are potentially in tension with the

fundamental SRA objectives of delegating to an independent, expert body in the judicial

branch of the government the finer details of formulating sentencing policy, and revising

that policy in light of actual court sentencing experience over time."  U.S. Sent'g

Comm'n, *Mandatory Minimum Penalties in the Federal Criminal Justice System* 122-23

(1991).  Yet, as shown next, the relevant amendments promulgated by the Commission

by its own choice were also without empirical support.

### B.  The Commission's Choices Were Not Based on Empirical Evidence or National Experience.

        *Increase to base offense level from 18 to 22.*  In 2004, the Commission increased

the base offense level in possession cases from o 18 to 11 "because of the increase in the

statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT

---

[11] *See generally* Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis. L. Rev. 1049,
1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis,
Tomaslav V. Kovandzic, & Thomas B. Marvel, *The Criminogenic Effects of
Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y
589, 614-16 (2007); *see also* U.S. Sent'g Comm'n, Staff Discussion Paper, *Sentencing
Options under the Guidelines* 19 (1996) (recognizing imprisonment has criminogenic
effects, including contact with more serious offenders, disruption of legal employment,
and weakening of family ties).

Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, *History* at 44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground").

The Commission has since acknowledged that the mandatory minimum to which Stephen Strobel's sentence is linked "may be excessively severe." U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 365 (2011). It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.*, and that prosecutorial charging practices suggest that prosecutors also believe that the mandatory minimum penalty is too high. *Id.* Thus, the current base offense level is not only devoid of empirical basis, but contrary to national experience.

*Counting each video as 75 images.* In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction [as] one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)). It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.*

The Commission did not provide any reason for this change. It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table. *See* U.S. Sent'g Comm'n, *History* at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range"). In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, but was based on the Department of Justice's request and Congress's number of images table, which itself was adopted without explanation or justification. The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm.

**C. Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose.**

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011).

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 2012 WL 2367084, at *6.

**D. The Original Guideline Is a More Appropriate Starting Point.**

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.1 "in terms that are persuasive on policy grounds." *Bistline*, 665 F.3d at 763, 764. The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; *see also Phinney*, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of § 2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months.").

The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991. That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991). The Commission expressed concern that raising penalties even higher "may aggravate this below-guideline rate and heighten sentencing disparity." *Id.*

Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing*

*Statistics*, tbl.28.  While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

In declining to follow § 2G2.2 on policy grounds, this Court will be in good company.  Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe.  *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, tbl.8 (2010).[12]  And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%).  *Id*. tbl. 11.  Here, we are asking for sixty months in federal prison— this is no small amount of time for someone who has never been in trouble with the law before.

## CONCLUSION

The Stephen Strobel has given compelling reasons why his proposed sentence is appropriate, he has cited other cases where similar sentences have been given and presented a comprehensive rebuttal of the main arguments for harsher penalties in child pornography cases.  An educated person like Stephen, who cooperated with police, has no criminal record, and strong family support, seems to be an excellent candidate for a person who should receive the minimal amount of time allowed, which in this case is sixty months.

---

[12] Available at
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

WHEREFORE, for the foregoing reasons the Defendant Stephen Strobel respectfully requests a Statutory Sentence of sixty months in the Bureau of Prisons and a five year term of supervised release with sex offense related restrictions as noted herein.

Respectfully submitted,

BRYDON, SWEARENGEN & ENGLAND,
By:

 /s/ Scott A. Hamblin
Scott A. Hamblin                    #48704
BRYDON, SWEARENGEN & ENGLAND
312 East Capitol Avenue
P. O. Box 456
Jefferson City, Missouri  65102-0456
Phone: (573) 635-7166
Fax:   (573) 635-3847 (facsimile)
Email: scotthamblin@brydonlaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants in this case.

*/s/*  Scott A. Hamblin